UNITED STATES of America, Appellee,

v.

Jack Kopel TUPLER and Bernard Haft, Appellants.

No. 76–2512.

United States Court of Appeals, Ninth Circuit

Nov. 22, 1977.

Burton C. Jacobson (argued), Beverly Hills, Cal., Bernard A. Berkman (argued) of Berkman, Gordon, Kancelbaum & Levy, Cleveland, Ohio, for appellants.

R. A. Wright (argued), Las Vegas, Nev., for appellee.

Before GOODWIN and SNEED, Circuit Judges and HILL *, District Judge.

GOODWIN, Circuit Judge:

After a jury trial, defendants Tupler and Haft were convicted on two counts of interstate transportation of obscene materials in violation of 18 U.S.C. §§ 2, 1462, and 1465. We reverse the convictions because the search warrant under which the allegedly obscene films were seized did not meet constitutional requirements.

There is no substantial dispute about the facts leading to the issuance of the warrant. On April 29, 1974, FBI Agent Murray received a call from the Las Vegas manager of Trans World Airlines. The manager told Agent Murray that a three-carton shipment from Philadelphia had just arrived, that the bill of lading described its contents as "leather novelties", and that one of the cartons was damaged and partially open. The open carton revealed smaller boxes containing 8-millimeter movie film. Affixed to the film boxes were photographic labels which portrayed sexual activity.

The following day, Agent Murray went to the airport, where the TWA manager showed him six of the film boxes.[1] Each of the boxes bore a different title and each purported to contain a film from one of two movie series: "Hollywood Swingers" or "party girls".

After examining the film boxes, Agent Murray returned all film boxes to their shipping cartons. He then went to the Downtown Adult Bookstore, the consignee of the shipment. He inquired about movies and was shown some twenty film boxes. Each box was labeled with a sexually explicit photograph and contained a reel of film. Five of the film boxes bore legends stating that they were part of the "party girls" series. The store clerk told Agent Murray that the films were "hard core". Murray left the bookstore without viewing a film or making a purchase.

Agent Murray's investigation led him to believe that defendant Haft worked for defendant Tupler as the manager of the Downtown Adult Bookstore. Murray further determined that Tupler had previously been convicted of interstate transportation of obscene materials and was currently under indictment in Nevada for another obscenity offense.

Through the Philadelphia office of the FBI, Murray discovered that the shipper of the three cartons, Stardust Enterprises, was located at the same address as P. Ingersoll, Inc., a motor-freight line. An FBI agent in Philadelphia went to the Ingersoll address and saw there a truck registered to Penn City Distributing Co. The Philadelphia FBI office told Murray that Penn City Distributing Co. was a known local obscene-film distributor.

Murray also learned that defendant Tupler had sent to San Francisco a Western Union money order which contained a telephone number. This number also appeared on the TWA bill of lading as that of the consignee's agent.

Agent Murray incorporated all the above information in an affidavit, together with a verbal description of the photographic labels which were affixed to the film boxes. Relying upon this affidavit, the district judge issued a warrant directing the FBI to seize one each of the several copies of the films from the TWA terminal. Meanwhile, however, the films had been delivered to the Downtown Adult Bookstore. An amended warrant accordingly directed the FBI to seize the films at the Bookstore together with evidence of interstate commerce. Both defendant Haft and Tupler were present when the warrant was executed.

The defendants argued below, and in this court, that the warrant was not based upon probable cause and that their motion to

---

* The Honorable Irving Hill, United States District Judge, for the Central District of California, sitting by designation.

1. For an analysis of the private-search-government-seizure issue, see *United States v. Sherwin*, 539 F.2d 1 (9th Cir. 1976). Here, nothing was taken by the TWA employee, and there is therefore no *Sherwin* problem.

suppress the films should have been granted.

■ We must start from the recognition that the films were presumptively protected by the First Amendment. *Roaden v. Kentucky,* 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973). Since seizure of First Amendment-protected materials constitutes a form of prior restraint, the materials are entitled to special treatment not accorded other forms of contraband. *See, e. g., Roaden v. Kentucky, supra* (seizure of allegedly obscene film without a warrant *per se* illegal under the Fourth Amendment although incident to an arrest); *A Quantity of Books v. Kansas,* 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964) (lack of adversary hearing prior to seizing large quantity of allegedly obscene material for purposes of destruction invalid, as different standards apply to searches and seizures governing allegedly obscene materials than to narcotics, gambling paraphernalia, and other contraband); *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) (standards for a warrant are more exacting when the things to be seized are books and the basis for their seizure is the ideas they contain).

■ First Amendment protection of allegedly obscene material includes the requirement that no seizure warrant be issued without a procedure "designed to focus searchingly upon the question of obscenity." *See Marcus v. Search Warrant,* 367 U.S. 717, 732, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961). No such procedure was followed in this case.

At the time the search warrant was issued, neither the FBI agent who wrote the affidavit for the warrant nor the judge who issued the warrant had ever viewed any part of the films. The affidavit upon which the warrant was based described in some detail the photographic labels which were affixed to the film boxes. This description may have given the judge probable cause to believe that the labels were obscene. However, labels may or may not fairly represent the contents of a package. These labels did not necessarily bear any relationship to the content of the films and, by themselves, provided only a reason to suspect that the films were obscene.

Moreover, even if the photographs on the outside of the boxes were shown to have been taken from frames of the films contained within the boxes, the agent's description of the labels in the affidavit would not give the judge probable cause to believe the films were obscene.

First Amendment standards require that any determination of obscenity be made considering the material as a whole. *See Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The *Miller* case stated a three-part test: (a) whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. The magistrate issuing a warrant to seize such protected material, accordingly, must have probable cause to believe that all three parts of the test will be satisfied by the material to be seized.

A single photographic print or "out take" from a roll of motion picture film might establish probable cause to believe that the film as a whole will meet the second, or in a rare case, the first part of the test, but an "out-take" could never establish probable cause to believe that the film "taken as whole, lacks serious literary, artistic, political, or scientific value."

The government points out that the judge did not base his determination solely upon the description of the film labels. He also considered the several pieces of circumstantial evidence showing: that the shipment had been falsely described in the bill of lading; that both the sender and the recipient of the shipment were known dealers in sexually explicit materials; that one of the suspects in this case had previously been convicted of an obscenity offense and

was currently under indictment for another; and that the clerk in the consignee bookstore described similarly labeled films as "hard core".

These bits of evidence, when viewed in combination, support an inference of obscenity. But inferring obscenity from a collection of extraneous circumstances does not "focus searchingly" on the question of the obscenity of the material itself. The process of building probable cause from the circumstances avoids focus on the content of the material. An examination of the surroundings alone will not do. A searching focus on obscenity requires the issuing judge or magistrate to base his evaluation of probable cause on direct evidence of the contents of at least a fair sample of the material itself.

■■■ First Amendment standards were not met in this case. Although a magistrate's determination of probable cause is entitled to great deference, *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), an adequate factual basis for seizure must be established. Here the magistrate made no searching inquiry into the question of obscenity. Because the films were seized without an examination of their contents, the defendants' motion to suppress them should have been granted. *See Heller v. New York*, 413 U.S. 483, 493 n. 11, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973); *Roaden v. Kentucky, supra.*

We need not reach the other points urged by the appellants in their briefs.

Reversed and remanded.

SNEED, Circuit Judge (concurring in the result):

I concur in the result reached by Judge Goodwin and with all of his opinion save those portions which discuss in general terms the circumstances in which probable cause can be established even though there is no examination "of at least a fair sample of the material itself." As I read Judge Goodwin, such circumstances are virtually non-existent. A "searching focus" on the question of obscenity requires this result, Judge Goodwin appears to say.

I believe this is too demanding. For example, I would affirm this conviction had Agent Murray viewed at the book store film contained in boxes similar to those discovered by the employee of Trans World Airlines, and in his affidavit had described what he saw in a manner that would permit the magistrate to have probable cause to believe that it was obscene. Obviously, the film shipped could have been different from the film Agent Murray would have viewed. But this possibility, in the light of the surrounding circumstances, to me is sufficiently remote to permit it to be ignored in determining the existence of probable cause to believe the material obscene. I doubt Judge Goodwin's opinion would permit me to reach this result.

We must not permit the "focus searchingly" requirement to become an elaborate ceremonial ritual useful only to the defendant by providing to him one more opportunity with which to extract himself from his difficulty by showing that the ceremony was not performed precisely as it should have been. The fundamental issue is whether there exists probable cause to believe the material obscene.

The "focus searchingly" requirement is rooted in the First Amendment. However, in complying with this standard we must not forget that the focus an erotic novel, for example, would require should be more demanding than that required by the film in this case. In applying the requirement we should be entitled to consider the nature of the market in which the material is being sold. Material destined for a market known to be one in which unquestionably obscene materials are sold should require a "focus" less "searching" than that destined for more artistically discriminating markets. After all, each of us knows that an adult book store does not stock cook books and Victorian novels. The First Amendment should not require us to ignore commercial realities; however, I fear Judge Goodwin's opinion literally construed may require us to do so.