**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Joseph MIDDLETON, Mastermind Productions, Bondi Walters, Variety Films, Inc., JACO Productions, Leroy Charles Griffith, George Edward Luther, Paris Follies, Inc., BGNO, Inc. and Leroy Griffith Enterprises, Defendants-Appellees.**

**No. 78–3149.**

United States Court of Appeals, Fifth Circuit.

Aug. 2, 1979.

Rehearing Denied Aug. 31, 1979.

John P. Volz, U. S. Atty., Robert J. Boitmann, Asst. U. S. Atty., New Orleans, La., for the U. S.

Charles E. Morris, Jr., Biloxi, Miss., for JACO Productions.

Louis B. Merhige, Michael Silvers, New Orleans, La., Elliott J. Abelson, Beverly Hills, Cal., for Charles Griffith, George Edward Luther and Paris Follies.

F. Irvin Dymond, Edward J. Castaing, Jr., New Orleans, La., for Joseph Middleton and Mastermind Productions.

Herbert S. Kassner, New York City, Wayne H. Carlton, Jr., New Orleans, La., for Bondi Walters and Variety Films.

Before GOLDBERG, AINSWORTH and KRAVITCH, Circuit Judges.

AINSWORTH, Circuit Judge:

This is a prosecution for interstate transportation of the allegedly obscene motion picture "Illusions of a Lady." The indictment charged various defendants [1] with one count of knowingly using a common carrier to ship an obscene film interstate, in violation of 18 U.S.C. §§ 1462 and 2; [2] one count of knowingly receiving from a common carrier an obscene film that had been transported interstate, in violation of 18 U.S.C. §§ 1462 and 2; [3] and one count of conspiracy under 18 U.S.C. § 371 to violate section 1462.[4] The Government appeals from the order of the district court granting defendants' motions to suppress the film as evidence. The trial judge found that the United States magistrate issued the warrant to seize a print of the movie without probable cause. As we conclude, however, that probable cause of the film's obscenity existed, we hold that the district judge erred in his ruling and reverse.

I. Facts

We take the facts pertinent to this appeal from the affidavit of FBI Special Agent Frank Quijada, which was filed with the United States magistrate in support of Quijada's application for a search warrant. The affidavit read in full as follows:

AFFIDAVIT FOR
SEARCH WARRANT

I, Frank S. Quijada, affiant, being duly sworn deposes and says:

1. Affiant is employed as a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice. Affiant has been assigned to the investigation of the interstate transportation of obscene matter, within the jurisdiction of the FBI.

---

1. The indictment named as defendants Mastermind Productions, the film's owner and producer; Joseph Middleton, an official of Mastermind; Variety Films, Inc., the movie's national distributor; Bondi Walters, the president of Variety; JACO Productions, the film's regional distributor; Leroy Charles Griffith and Leroy Griffith Enterprises, owners of codefendant Paris Follies, Inc., which in turn owned and operated the Sinerama Adult Theatre; George Edward Luther, Griffith's business manager; Paris Follies, Inc., and BGNO, Inc.

2. Section 1462 provides in pertinent part that whoever brings into the United States, or any place subject to the jurisdiction thereof, or knowingly uses any express company or other common carrier, for carriage in interstate or foreign commerce—
   (a) any obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print or other matter of indecent character; or

   .     .     .     .     .

   whoever knowingly takes from such express company or other common carrier any matter or thing the carriage of which is herein made unlawful—
   shall be fined not more than $5,000 or imprisoned not more than five years, or both, for

the first offense and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter.

Under 18 U.S.C. § 2,
   (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
   (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

All the defendants were indicted on this count.

3. The indictment charged only Griffith, Leroy Griffith Enterprises, Luther, Paris Follies, Inc. and BGNO, Inc. under this count.

4. Under 18 U.S.C. § 371, "[I]f two or more persons conspire . . . to commit any offense against the United States, . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

All the defendants were charged with conspiracy.

2.  Affiant has conducted an investigation of the Sinerama Adult Theatre, 3615 Tulane Avenue, New Orleans, Louisiana, and as a result of my personal participation in the investigation, I have personal knowledge of the facts set out in this affidavit.

3.  Affiant, based on the facts set forth in this affidavit, now has reason to believe and does believe that on the premises known as the Sinerama Adult Theatre, further described as a beige colored brick, glass fronted building appearing from the outside to be two stories, with a portico facing Tulane Avenue displaying three signs, one on each of three sides, stating Adult Sinerama Theatre. The words Adult and Theatre are written in black and the word Sinerama is in white block letters. The letters S, N, R, and M of Sinerama are on a red background and the letters I, E, A, and A are on a blue background. The Sinerama Adult Theatre is located at 3615 Tulane Avenue, and is bounded on the west side by South Telemachus Street and on the east side by South Genois.

4.  The basis for affiant's beliefs set forth above are as follows:

5.  On July 6, 1976, I observed an advertisement in the movie section of the "Times-Picayune" newspaper, New Orleans, Louisiana, dated July 6, 1976, for the Sinerama Adult Theatre, 3615 Tulane Avenue, New Orleans, Louisiana, telephone 488–3731. This advertisement stated that the currently featured movies playing at the Sinerama Adult Theatre were "Hullucination of a Lady" plus "Black Socks." This advertisement listed the address for the Sinerama Adult Theatre as 3615 Tulane Avenue, New Orleans, Louisiana, and listed the theatre telephone number as 488–3731.

6.  On July 7, 1976, at approximately 11:05 A.M., I called telephone number 488–3731 and a male answered by saying "Sinerama Theatre." When I asked what features were currently playing at the Sinerama, the individual advised that the features were "Illusions" and "Black Socks."

7.  On July 6, 1976, I contacted Robert E. Parrish of Film Inspection Service, 2411 Edenborn Avenue, Metairie, Louisiana. Parrish provided Film Inspection Service records to me which contained the below-described information:

a.  Records revealed that the films entitled "Illusions of a Lady" and "Black Socks" were received by the Film Inspection Service, Metairie, Louisiana, on July 1, 1976, and that the films arrived from Atlanta, Georgia, where they had been shipped under Profit by Air Bill Number 30697741.

b.  Records revealed that the films were given to the Sinerama Adult Theatre, New Orleans, Louisiana, on July 1, 1976, for a play date of July 2, 1976 through July 8, 1976.

c.  Records revealed that the film "illusions of a Lady" consisted of eight 1,000-foot reels.

8.  On July 7, 1976, Special Agent (SA) Aloysius J. McFall viewed the color movie "Illusions of a Lady" at the Sinerama Adult Theatre, 3615 Tulane Avenue, New Orleans, Louisiana, after paying an admission price of $5.00. The below is a description of the color movie "Illusions of a Lady" as described to me by SA McFall.

a.  SA McFall advised me that the credits that appear at the beginning of the film show the title of the film to be "Illusions of a Lady" with two subordinate titles. He further advised that the credits show that the film is a Jonas Middleton Production starring Andrea True.

b.  SA McFall advised me that at approximately 10:15 AM the movie, "Illusions of a Lady" began with a scene showing a white male model kissing the breast, thighs and vagina of a white female model. The male model is shown performing cunnilingus on the vagina of the white female and penetration by the tongue of the white male of the vagina is explicitly shown.

c.  SA McFall advised me that another scene shows a white female model sitting on a couch and a white male model kneeling in front of the female. The female grabs the head of the male and she pulls it on to her vaginal area.

d. SA McFall advised that the movie contains a scene where a white male model is kissing a white female and that the female then assumes a reclining position on a table and that the male model is observed mounting the female and inserting his penis into her vagina. Sexual intercourse is explicitly shown with penetration from different angles.

e. SA McFall advised me that the movie contains a homosexual scene wherein two white nude females are observed performing the act of cunnilingus on each other with penetration of the tongue of the vagina clearly shown.

f. SA McFall advised me that the movie shows a scene where a white female model performs the act of fellatio on a white male model. The scene shows the penis of the male model penetrating into the mouth of the female while the female simultaneously masturbates the penis of the male.

g. SA McFall advised me that the film contains a scene wherein a white male model is observed to lay out the undergarmets of a female in the relative position as if they where on a woman. The male is observed fondling each piece of undergarmet and smells the panties before putting them on the rug. The male model fondles his penis and then lays on top of the undergarmets and performs hip motions as if he is engaged in the act of intercourse with the panties. The male model then dresses himself in the female undergarmets.

h. SA McFall advised me that the movie contains another homosexual scene where two white female models are observed kissing each other on the mouth and then one female model performing the act of cunnilingus on the second female with penetration of the tongue of the vagina clearly shown from different angles.

i. SA McFall advised me that the movie contains a scene wherein a white male model is shown masturbating his penis while at the same time fondling and kissing the heel of a black shoe. The male continues to masturbate until he ejaculates onto some female undergarmets which are in front of his penis. After the male ejaculates on the undergarmets he urinates on them.

j. SA McFall advised me that the movie contains a scene of unnatural sexual activity. A white female model inserts a carrot into her vagina and penetration of the carrot into the vagina is clearly shown. While the female inserts the carrot into her vagina she masturbates her clitoris with her other hand. The female then withdraws the carrot from her vagina and licks it with her tongue several times.

k. SA McFall advised me that the movie shows another scene of unnatural sexual activity when a white male model masturbates while a white female model holds a spoon in front of his penis. The male ejaculates and semen is shown falling on the spoon. The female then places her right index finger in the semen and then puts the right index finger in her mouth. The female then pours the semen in the spoon into a metal teapot and pours hot water into the teapot.

l. SA McFall advised me that the movie contains a scene of group sex involving three white female models and two white male models. A female model is observed inserting a cucumber into her vagina and subsequently removing it and inserting it into her mouth. A male is observed performing the act of cunnilingus on a female and penetration of the tongue into the vagina is explicitly depicted. A female performs the act of fallatio on a male and penetration of the penis into the mouth is clearly shown. Two females then perform fallatio on the penis of one of the males and insertion of the penis into the mouth of the female is clearly shown as is the kissing of the scrotums by the second female. The male then ejaculates on to the face and semen is clearly shown on the face of one of the females.

m. SA McFall advised me that the movie contains another scene of group sex wherein two white male models grab a

white female model and one of the male models performs the act of sexual intercourse on the female with penetration clearly shown. While one male model performs intercourse on the female the second male appears to be striking the female with a black leather strap. After the two males perform intercourse with the female the two males then perform sexual intercourse and cunnilingus with three other females.

n. SA McFall advised me that the film ended at approximately 11:20 AM.

o. WHEREFORE, your affiant prays that a search warrant be issued to any Special Agent of the Federal Bureau of Investigation, a branch of the United States Department of Justice, authorizing him to conduct a search in the daytime on the premises located at the Sinerama Adult Theatre, 3615 Tulane Avenue, New Orleans, Louisiana; and authorizing him to take from the premises all such things as described above found anywhere in the premises including but not limited to the currently featured obscene color movie entitled "Illusions of a Lady", records, waybills, feight bills, bills of lading, invoices, order forms, delivery and/or payment receipts, cancelled checks, statements and other items to the end that same may be dealt with according to law.

s/Frank S. Quijada

FRANK S. QUIJADA
Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed to in my presence this 8th day of July, 1976.

s/Ingrid O. Johannesen

United States Magistrate,
Eastern District of Louisiana

On July 8, the United States magistrate issued a warrant, pursuant to which FBI agents searched the Sinerama and seized the theatre's copy of "Illusions of a Lady." A grand jury subsequently indicted defendants, who then filed motions to suppress and return "all evidence seized by govern-

ment agents on the ground[ ] . . . that the search warrant was issued without probable cause." They contended that Agent Quijada's affidavit "fails to inform the magistrate whether" the twelve scenes of explicit sex therein described "are representative of all portions in the movie" and "whether the film contains a story line, dialogue, narrative or any portions of a non-sexual nature." Defendants argued that the magistrate was therefore unable to determine, as *Miller v. California* dictates, the probable obscenity of the film "taken as a whole." 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973).

The district judge agreed with that contention and granted the suppression motions. He noted "the strict standards for obtaining a warrant for material which has presumptive First Amendment protection," stated that the *Miller* obscenity test "require[s] examination of the work as a whole," and concluded that "the description of the film in the affidavit is incomplete on its face and could not have provided the magistrate with an opportunity to 'focus searchingly' upon the issue of obscenity . . . under the definition . . . contained in *Miller.*" Observing that the "affidavit does not reveal the approximate length of time devoted" to the explicit sex scenes, "so that it is not apparent whether the scenes comprise the entire film or a minute portion of it," the trial court held "that the affidavit *is insufficient to support a finding that the film is obscene.*" (emphasis added)

## II. The District Court's Failure to Apply the Proper Standard

■ A search and seizure involving material "presumptively under the protection of the First Amendment" must clear "a higher hurdle in the evaluation of . . . reasonableness" under the Fourth Amendment than must similar actions aimed at mere contraband, "because we examine what is 'unreasonable' in the light of the values of freedom of expression." *Roaden v. Ken-*

*tucky,* 413 U.S. 496, 504, 93 S.Ct. 2796, 2801, 37 L.Ed.2d 757 (1973). *See Lee Art Theatre v. Virginia,* 392 U.S. 636, 637, 88 S.Ct. 2103, 2104, 20 L.Ed.2d 1313 (1968); *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1964); *Marcus v. Search Warrants,* 367 U.S. 717, 732, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961). To safeguard those values, the Supreme Court has prescribed a "step in the procedure before seizure designed to focus searchingly on the question of obscenity," *Marcus v. Search Warrants, supra,* 367 U.S. at 732, 81 S.Ct. at 1716; *Lee Art Theatre v. Virginia, supra,* 392 U.S. at 637, 88 S.Ct. at 2104, so that a warrant is issued after an independent determination by a neutral magistrate, rather than "solely upon the conclusory assertions of the police officer." *Lee Art Theatre v. Virginia, supra,* 392 U.S. at 637, 88 S.Ct. at 2104; *Marcus v. Search Warrants, supra,* 367 U.S. at 732, 81 S.Ct. at 1716.[5]

▮ The district judge apparently reasoned, given this "searching focus" requirement, that a warrant may not issue unless the underlying affidavit is sufficient "to support a finding that the film is obscene." To our knowledge, however, no court has ever held that the Government, in order to obtain a warrant in an obscenity case, must show in its affidavit either prima facie evidence of illegality or proof beyond a reasonable doubt. Rather, "[a]t the time the warrant was requested, the question before the magistrate was one of probable cause" that a violation of the obscenity laws had occurred. *United States v. Sherpix,* 1975, 168 U.S.App.D.C. 121, 128–29, 512 F.2d 1361, 1368–69; *United States v. Bush,* 5 Cir.,

5. In *Marcus,* a Kansas City police officer filed sworn complaints stating that " 'of his own knowledge,' " a newspaper distributor " 'kept for the purpose of [sale] . . . obscene . . . publications.' " Although the officer included no copy or further description of any publication in the complaint, a state judge issued search warrants that in effect authorized the police to seize all magazines and newspapers they judged to be obscene. The officers seized "[a]pproximately 11,000 copies of 280 publications." 367 U.S. at 722–23, 81 S.Ct. at 1711. The Supreme Court decried this procedure because it included "no step . . . before seizure designed to focus searchingly on the question of obscenity." The "warrants issued on the strength of the conclusory assertions of a single police officer, without any scrutiny by the judge of any materials considered by the complainant to be obscene," and since they merely tracked the language of the statutes and complaints, "specif[ying] no publications," the warrants "gave the broadest discretion to the executing officers," resulting in "*ad hoc* decisions on the spot . . . with little opportunity for reflection and deliberation." 367 U.S. at 731–32, 81 S.Ct. at 1716. In the present case, the FBI agent's affidavit contained a detailed description of the allegedly obscene movie, rather than mere "conclusory assertions," and the search warrant specified the single film to be seized, thereby ensuring that the executing officers lacked the unfettered discretion that the Supreme Court condemned in *Marcus.*

*Lee Art Theatre* involved an affidavit supporting a search warrant which "stated only the titles of the motion pictures and that the officer had determined from personal observation of them and of the billboard in front of the theatre that the films were obscene." The Court held, relying on *Marcus,* that "[t]he procedure under which the warrant issued solely upon the conclusory assertions of the police officer without any inquiry by the justice of the peace into the factual basis for the officer's conclusions was not a procedure 'designed to focus searchingly on the question of obscenity.' " 392 U.S. at 636–37, 88 S.Ct. at 2104. Again, the warrant proceedings in the instant case obviously contrast sharply with the procedure denounced in *Lee.*

In *Marcus* and *Lee,* the Supreme Court concluded that certain types of warrant proceedings do not afford the necessary "searching focus," but the Court has never identified as a constitutional requirement any specific alternative procedure. It has expressly declined to hold that a magistrate must personally view a film before issuing a warrant to seize it, *id.;* *Heller v. New York,* 413 U.S. 483, 488, 93 S.Ct. 2789, 2792, 37 L.Ed.2d 745 (1973), stating instead only the general rule that if "a seizure is pursuant to a warrant, issued after a determination of probable cause by a neutral magistrate, and following the seizure, a prompt judicial determination of the obscenity issue is available at the request of any interested party, the seizure is constitutionally permissible." *Heller v. New York, supra,* 413 U.S. at 492, 93 S.Ct. at 2795. As we interpret *Marcus, Lee* and *Heller,* we must decide on the facts of each case whether the manner in which the magistrate determined probable cause enabled him "to focus searchingly on the question of obscenity."

1978, 582 F.2d 1016, 1019; *United States v. Sherwin*, 9 Cir., 1977, 572 F.2d 196, 198–99; *United States v. Tupler,*, 9 Cir., 1977, 564 F.2d 1294, 1297; *United States v. Christian*, 10 Cir., 1977, 549 F.2d 1369, 1371; *United States v. Pryba*, 1974, 163 U.S.App.D.C. 389, 402, 502 F.2d 391, 404; *Perial Amusement Corp. v. Morse*, 2 Cir., 1973, 482 F.2d 515, 521. *See Heller v. New York*, 413 U.S. 483, 488, 93 S.Ct. 2789, 2795, 37 L.Ed.2d 745 (1973).[6]

A showing of " '[p]robable cause' requires much less evidence than a finding of guilt requires . . .," *United States v. Beck*, 5 Cir., 1970, 431 F.2d 536. *See United States v. Ventresca*, 380 U.S. 102, 107, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965); *United States v. Pryba, supra*, 163 U.S.App. D.C. at 402, 502 F.2d at 404, for "[i]n dealing with probable cause . . . , as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). When an affidavit states facts and circumstances within the knowledge of the applying officer, based upon "reasonably trustworthy information," which are "sufficient in themselves to warrant a man of reasonable caution in the belief" that a crime has taken place, probable cause exists

and the magistrate may properly issue the warrant. *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925); *Brinegar v. United States, supra*, 338 U.S. at 176, 69 S.Ct. at 1311; *United States v. Hill*, 5 Cir., 1974, 500 F.2d 315. *See also Gerstein v. Pugh*, 420 U.S. 103, 112, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975); *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). Moreover, a magistrate's "determination of probable cause should be paid great deference by reviewing courts," *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 591, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964); *Bastida v. Henderson*, 5 Cir., 1973, 487 F.2d 860, 863.[7] Our task here, therefore, "is not to substitute [our] judgment as to probable cause, but only to determine whether there was a substantial basis for the magistrate's determination . . . ." *United States v. Fuller*, 4 Cir., 1971, 441 F.2d 755, 759.

### III. Probable Cause of Obscenity Supported Issuance of the Warrant

In *Miller v. California, supra*, the Supreme Court reaffirmed the principle established in *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) that the First Amendment does not protect obscene material and announced the following "basic guidelines for the trier of fact"

---

**6.** The Court made clear in *Heller* that the "searching focus" required under *Marcus* and *Lee* is directed to the question of *probable* obscenity, declaring that a "seizure is constitutionally permissible" if conducted "pursuant to a warrant, issued after a determination of probable cause by a neutral magistrate, and, following the seizure, a prompt judicial determination of the obscenity issue in an adversary proceeding is available at the request of any interested party . . . ." 413 U.S. at 492, 93 S.Ct. at 2795. *Marcus* and *Lee* did not dictate a showing of more than probable cause, but rather acknowledged the historical lesson "that the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are" expressive matter, and recognized the "constitutional impossibility of

leaving the protection of [First Amendment] freedoms to the whim of the officers charged with executing the warrant . . . ." *Stanford v. Texas, supra*, 379 U.S. at 485, 85 S.Ct. at 511–12. *See* footnote 6 *supra*.

**7.** "In issuing a search warrant the magistrate must exercise his own judgment as to whether the facts alleged in the affidavit constitute probable cause for issuance of the warrant, he must act on the entire picture disclosed to him, he is entitled to use his common sense, and *the courts have gone so far as to say that when this is done his determination is conclusive in the absence of arbitrariness.*" (emphasis added) (citations omitted) *Bastida v. Henderson, supra*, 487 F.2d at 863.

on the issue of obscenity: "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable . . . law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." (citations omitted) 413 U.S. at 24, 93 S.Ct. at 2615. The Court also gave "a few plain examples of what a . . . statute could define for regulation under part (b) of the standard announced in this opinion . . .: (a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated. (b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibitions of the genitals." *Id.*, 413 U.S. at 25, 93 S.Ct. at 2615.[8] Following *Miller*, in *Jenkins v. Georgia*, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642, the Supreme Court stressed again that it is not sexual conduct or nudity alone which renders a film obscene, but rather the manner in which the movie depicts a sexually explicit subject.[9]

As the district court noted, "both factors (a) and (c) of the Supreme Court test require examination of the work 'as a whole.'" The FBI agent's affidavit described in great detail twelve scenes of explicit sex depicted in the film. However, the trial judge held that since it did "not reveal the approximate length of time devoted to those scenes, . . . [n]or . .

give any hint as to the context in which the scenes [were] presented," the affidavit was "incomplete on its face and could not have provided the magistrate with an opportunity to 'focus searchingly' upon the issue of obscenity as required by *Marcus* and *Lee Art Theatre* under the definition of obscenity contained in *Miller*."

We disagree with the district judge's conclusion. Consistent precedent teaches that officers seeking a warrant to seize an allegedly obscene film need not provide the magistrate with a full screenplay, narrating all the action and dialogue. In this court's decision in *United States v. Bush, supra*, for example, an FBI agent appended to his affidavit the cover of a film box that "depicted not only explicit sex but also contained a 50-word summary of the contents of the film." 582 F.2d at 1020. Copies of two other film covers also "presented dauntingly explicit sex" and the allegedly obscene movies "were found in a carton falsely labeled," an "apparent deception" which "also suggested that wrongdoing might be underway." *Id.* at 1021. Though the government agent had not viewed the films, and thus could not relate his own version of their contents in the affidavit, we nevertheless held that "the magistrate had sufficient probable cause to believe that obscenity laws were being violated." *Id.*[10] The Ninth Circuit, after considering an affidavit that merely described a magazine as "contain[ing] color photographs of 'completely nude males and females engaging in various sexual activities, including sexual intercourse, cunnilingus, oral copulation and other sexually explicit

---

**8.** The *Miller* test must be applied to a proper determination of whether probable cause exists for the issuance of a warrant as well as to the determination of guilt or innocence upon a trial on the merits. The difference, however, is in the degree of evidence—less being required for probable cause than for proof beyond a reasonable doubt.

**9.** In concluding that the film "Carnal Knowledge" was not obscene, the Court pointed out that "[w]hile the subject matter of the picture is, in a broader sense, sex, and there are scenes in which sexual conduct including 'ultimate sexual acts' is to be understood to be taking

place, the camera does not focus on the bodies of the actors at such times. There is no exhibition whatever of the actors' genitals, lewd or otherwise, during these scenes." 418 U.S. at 161, 94 S.Ct. at 2755.

**10.** We also noted that by placing the picture and 50-word summary on the cover of the film box, "the distributor was declaring that the sum and substance of the film constituted unmitigated obscenity. The magistrate was entitled to take him at his word." 582 F.2d at 1020.

acts,' " ruled that the document "was sufficient to allow the magistrate to make his own determination of probable cause" and concluded that "the issuance of the warrant was proper." *United States v. Sherwin, supra,* 572 F.2d at 198–99. Similarly, in *United States v. Pryba, supra,* the D.C. Circuit "[had] no difficulty whatever in accepting . . . as an adequate foundation" for the magistrate's finding of probable obscenity an affidavit which simply "stated that the 'films depict' not only 'a man and a female engaged in sexual intercourse' but also 'various other sexual activities by males and males' as well as by 'males and females.' " 163 U.S.App.D.C. at 402, 502 F.2d at 404.[11] Further, the Second Circuit held in *Perial Amusement Corp. v. Morse* that a magistrate "had ample factual support for his conclusion that probable cause existed," 482 F.2d at 524, in an affidavit which contained an apparently conclusory "description of the motion picture *as consisting for the most part* of a series of scenes vividly depicting discrete and explicit acts of sexual intercourse, homosexuality, sadism, fellatio, and cunnilingus, with close-up 'scenes centering on the sexual organs showing penetration and withdrawal with subsequent ejaculation.' " *Id.* at 517 (emphasis added). *See United States v. Christian, supra,* 549 F.2d at 1370–71;[12] *United States v. Sherpix, Inc., supra,* 168 U.S.App. D.C. at 128–29, 512 F.2d at 1368–69.[13] *Cf. United States v. Tupler, supra,* 564 F.2d at 1297–98.[14]

The affidavit involved here was far more thorough than those accepted as sufficient

**11.** In *Pryba,* the court stated that "[u]nlike the affidavits in [*Marcus*] and [*Lee*], which set forth nothing more than bare conclusory allegations that the materials to be seized were obscene—the affidavit here describes, though in good taste briefly, what the films depict." 163 U.S.App.D.C. at 403 n. 89, 502 F.2d at 404 n. 89.

**12.** In *Christian,* an Oklahoma City police officer said in his affidavit that the film "Sexual Customs in Scandinavia" "showed unnatural copulation and simulated natural sex acts which were filthy, morally foul, polluted, nasty, dirty, vulgar, debasing, having a tendency to corrupt or debauch, indecent, morally offensive and depraving, lascivious, wanton and lustful, lewd, licentious, lecherous, dissolute, debauched, impure, salacious and pornographic, depicting numerous scenes of sexual intercourse male and female, one female masturbating, and unnatural copulation between male and female . . . ." 549 F.2d at 1370. The Tenth Circuit concluded that "[j]udged by any judicial standards, the sexual activities explicitly described in the officer's affidavit were 'hard core' pornography, obscene, and constituted probable cause for the issuance of the warrant." *Id.* at 1371.

**13.** In *Sherpix,* the court found that an FBI agent's affidavit, "a lengthy account of" an allegedly obscene film, "describing each scene in detail and with explicit language, but suggesting no conclusions to be drawn from the description," was sufficient to support the magistrate's finding of probable cause. 168 U.S.App.D.C. at 128–29, 512 F.2d at 1368–69.

**14.** In *Tupler,* which also involved a seizure of allegedly obscene movies, when "the search warrant was issued neither the FBI agent who wrote the affidavit for the warrant nor the judge who issued the warrant had ever viewed any part of the films." The affidavit "described in some detail the photographic labels which were affixed to the . . . boxes" containing the films, but the Ninth Circuit asserted that "labels may or may not fairly represent the contents of a package" and therefore concluded that the labels, "by themselves," could not establish probable cause that the movies were obscene. After reiterating the *Miller* obscenity test, the court reasoned that while "[a] single photographic print or 'out take' from a roll of motion picture film might establish probable cause to believe that the film as a whole" met the first two parts of the test, it "could never establish probable cause to believe that the film 'taken as [a] whole, lacks serious literary, artistic, political or scientific value.' " 564 F.2d at 1297.

In this regard we suggested in *United States v. Bush, supra,* citing the D.C. Circuit's opinion in *United States v. Pryba, supra,* "that the position of the Ninth Circuit may be unduly demanding." 582 F.2d at 1019. However, whether or not the *Tupler* standard is too rigorous, the affidavit involved here would easily satisfy it. The *Tupler* majority stressed that it was granting defendants' suppression motion "[b]ecause the films were seized without an examination of their contents" and declared that "[a] searching focus on obscenity requires the issuing judge or magistrate to base his evaluation of probable cause on direct evidence of the contents of *at least a fair sample of the material itself.*" 564 F.2d at 1298 (emphasis added). In the present case, an FBI agent had viewed the film to be seized in its entirety and his thorough narration of the movie's porno-

to support findings of probable cause in the foregoing cases from this and other circuits. Moreover, it is a basic principle that "in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense." *Spinelli v. United States, supra,* 393 U.S. at 419, 89 S.Ct. at 591; *Bastida v. Henderson, supra,* 487 F.2d at 863. Agent Quijada's affidavit informed the magistrate that the movie "Illusions of a Lady" was playing at a self-proclaimed "adult theatre." The film, only 65 minutes long, included twelve scenes explicitly portraying intercourse, oral sex and the most lurid acts of fetishism. The affidavit related these passages in graphic detail, thereby enabling the magistrate "to focus searchingly on the question of obscenity." Some of these episodes contained successive acts which common sense dictates would require several minutes to perform and thus would consume a substantial portion of the entire film time, negating the concern of the district judge that the scenes might represent but a "minute" part of the movie. This fact, combined with the film's repetitive emphasis on the genitals during sex acts and its depiction of a panoply of sexual conduct in a manner beyond the acceptable boundaries of *Jenkins v. Georgia, supra,* satisfies parts (a) and (b) of the *Miller* test and effectively diminishes any reasonable expectation that the twelve scenes of explicit sex could be fragmented portions of a film which, "taken as a whole," had serious literary, artistic, political or scientific value, thus satisfying part (c).

Our holding here turns, like every determination of probable cause, on the particular facts of this case. Under the circumstances involved here, by employing his common sense, the magistrate could reasonably find probable cause under all three elements of the *Miller* standard that the film, taken as a whole, was obscene. Thus, we conclude that the magistrate did not err in issuing the search warrant and therefore reverse the district court's erroneous order granting defendants' motions to suppress.

REVERSED AND REMANDED.

---

graphic contents provided the magistrate with "direct evidence" of far more than a mere "fair sample of the material itself." *See United States v. Sherwin, supra,* 572 F.2d 196 (this decision, which postdates *Tupler,* illustrates that the Ninth Circuit does not require a magistrate to supply his own "direct evidence" by personally viewing the allegedly obscene film before issuing a warrant).