**STATE**

v.

**John J. TAVONE.**

**No. 82–62–C.A.**

Supreme Court of Rhode Island.

Sept. 20, 1984.

See also, 446 A.2d 741.

Dennis J. Roberts II, Atty. Gen., Margaret R. Levy, Sp. Asst. Atty. Gen., for plaintiff.

John F. Sheehan, Providence, for defendant.

## OPINION

MURRAY, Justice.

This is an appeal by the defendant, John J. Tavone, from a Superior Court conviction on one count of knowingly promoting for commercial gain an obscene motion picture in violation of G.L.1956 (1981 Reenactment) § 11–31–1. The defendant was indicted by a Kent County Grand Jury and charged with three separate counts of violating § 11–31–1. Pretrial motions commenced on December 3, 1981. The trial began on December 4, 1981, before a justice of the Superior Court and a jury. On December 11, 1981, the jury found the defendant guilty on count 1 of the indictment.

On February 20, 1981, the date of the offense, defendant was the owner and operator of the Palace Theater, located in the town of West Warwick. The defendant advertised and then exhibited, at the theater, X-rated films. Sometime prior to February 1981, the theater, had been operated by Rhode Island Films, Inc. During that time, defendant was the owner and landlord of the theater.

During the tenancy of Rhode Island Films, Inc., the theater became embroiled in a dispute with the town of West Warwick—with the town apparently attempting to stop the showing of X-rated movies. A civil action was commenced by the parties then operating the theater which resulted in the entry of an order temporarily restraining, inter alia, the West Warwick Chief of Police and the town council from harassing the theater operators or from interfering with the exhibition of films at the theater. The town, which had revoked the theater's license and had refused to issue any further licenses to the theater operators, then began to issue licenses for the exhibition of films to the theater with the notation "Pursuant to Court Order No. 75–262."

At some point, prior to the date of the offense, defendant assumed the operation of the theater. The defendant continued to advertise and exhibit X-rated films. Each time defendant applied for a license to exhibit films, it was issued with the same notation, "Pursuant to Court Order No. 75–262." The license that was issued for the month of February 1981, however, did not bear this notation.

On February 20, 1981, after consulting the newspaper advertisements placed by defendant to determine what films were to be shown at the Palace Theater that evening, two Rhode Island State Police detectives viewed two films in their entirety at the theater. These films were entitled "Baby Blue" and "Maraschino Cherry." After viewing these two films, one of the detectives made application, supported by a detailed affidavit, for a search warrant. This affidavit graphically described two scenes from each film and briefly indicated the nature of other scenes in the films.

The detectives obtained a search warrant from a justice of the Superior Court and returned to the theater on the following evening. After viewing a portion of the film exhibition to verify that the same films were being shown, the detectives seized the two films. The defendant subsequently arrived at the theater and was arrested. The defendant was indicted, tried, and convicted on count 1—in regard to the film "Baby Blue."

Prior to trial, defendant moved for a dismissal of the indictment based upon the theory that the state was barred from bringing criminal charges against him under the law of *State v. Berberian*, R.I., 427 A.2d 1298 (1981). The defendant also moved to suppress the seized films on the ground that there was no probable cause for the issuance of the search warrant. These motions were denied by the trial justice. The defendant contends that the trial justice's rulings upon these motions were erroneous; therefore, he raises only these issues upon appeal to this court.

With regard to the question of whether the state was barred from instituting criminal charges against defendant, the state argues that defendant's reliance upon *Berberian* is misplaced. We agree. While the facts in *Berberian* are similar to those of the case before us, there are significant distinctions. In *Berberian* the defendants applied to the Bureau of Licenses (bureau) for the City of Providence for a license authorizing the showing of two specific films. *Id.*, 427 A.2d at 1299. The record in that case also disclosed that upon the filing of the application, the defendants made the films available to the bureau for viewing. *Id.* The bureau issued a license to permit the showing of the films without itself viewing them. The films were exhibited by the defendants in reliance upon the bureau's actions. Subsequently, the State Police seized the films, and the defendants

were ultimately indicted and charged with violating § 11–31–1. *Id.*

In *Berberian* we upheld the trial justice's dismissal of the indictments against the defendants. We found in that case that

> "the issuance of a license by the Bureau for the subject films did indeed constitute an official and express assurance from which, absent a final determination that the films were obscene, no criminal prosecutions against defendants under § 11–31–1 could attach." *Id.*, 427 A.2d at 1301.

We also found, consequently, that the defendants had a right to rely on the license issued by the bureau.

We cannot reach the same conclusion in the present case. In *Berberian* we pointed out that through the enactment of G.L.1956 (1976 Reenactment) § 5–22–5, the Legislature has delegated its police power to the cities and towns. 427 A.2d at 1300–01. We also pointed out in that case that the relevant section of the Providence Code of Ordinances properly set forth the procedures and criteria to be followed by the bureau in accordance with § 5–22–5. 427 A.2d at 1301. Pursuant to § 5–22–5, the Providence ordinance gave the bureau the option of either granting the license sought by the defendants or commencing judicial proceedings to adjudge the films obscene. We found, then, that the effect of the bureau's actions in issuing the license was that the films were not obscene. 427 A.2d at 1301. A very different situation confronts us here.

In the present case, the town of West Warwick at the time of the offense had not adopted a procedure whereby films could be viewed and a determination could be made either to license such films or to commence judicial proceedings to adjudge the films obscene.[1] Furthermore, the record does not disclose that defendant ap-

---

1. Section 3–12 of the code of Ordinances of the Town of West Warwick merely provides that "[n]o person shall within the town publicly, or for pay or for any profit or advantage to himself, exhibit or present or take part in any exhibition or theatrical performance or other show or performance without obtaining a license for the same from the town council."

plied to the town council for a license to exhibit the specific films in question. Neither is there any indication that the films were made available to the town council for viewing. Given these facts, we are satisfied that the license issued to defendant by the town council was a general license to exhibit films—nothing more.

On the basis of the record before us, we cannot say that the actions of the West Warwick Town Council amounted to the same sort of official assurance as the action of the Providence Bureau of Licenses in *Berberian*. In the present case, the issuance of a general license to exhibit films did not, and could not, constitute an official assurance that any films that defendant might decide to exhibit would not be adjudged obscene. If, in fact, defendant relied upon the issuance of these general licenses as such an official assurance, his reliance was sorely misplaced.

■ In *Berberian*, we recognized that "in certain situations when an authoritative government agency or voice issues an official assurance or affirmatively misleads a defendant into believing that criminal sanctions do not apply to his behavior, no criminal sanctions will attach to the defendant because the defendant has been deprived of notice about what conduct the government intended to make criminal in violation of due process." *Id.* 427 A.2d at 1301 (citing *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973); *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471, *reh. denied*, 380 U.S. 926, 85 S.Ct. 879, 13 L.Ed.2d 841 (1965); *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959)).

The present case does not present such a situation. In no way can the town council be said to have affirmatively misled defendant into believing that through the issuance of a general license the town had given up in its right to challenge as obscene films that might be shown at the Palace Theater. Were we to hold other-

wise, we would essentially be saying that a defendant has a right to rely upon a general license to exhibit films, issued in the absence of established procedures for determining obscenity, as a defense to a prosecution for violating § 11–31–1. This we will not do.

The defendant makes much of the fact that licenses had been issued to him with the notation "Pursuant to Court Order No. 75–262." It is defendant's contention that this notation reinforces his argument of official authorization for the exhibition of films like "Baby Blue." We agree with the trial justice that this notation adds little, if anything, to defendant's argument. The defendant was not a party to the civil action that resulted in the issuance of the temporary restraining order requiring the town, inter alia, to refrain from harassing the then operators of the theater. Furthermore, the case from which the court order originated had been dismissed without appeal in September 1980, several months before the date of the offense. The mere fact that the town council had previously been enjoined from not acting on applications regarding the Palace Theater, and subsequently issued licenses to defendant bearing reference to the prior court order, does not change the fact that no determination was ever made by the town council concerning the obscenity of specific films to be shown at the theater.

■ In light of the foregoing analysis, we find that the trial justice was correct in denying defendant's motion to dismiss.

The defendant also challenges the trial justice's denial of his motion to suppress the two films seized by the State Police. It is defendant's contention that the supporting affidavit upon which the search warrant was issued did not provide the magistrate with sufficient information from which a determination of probable cause could be made. We disagree. Even though defendant properly sets forth the requirements of the Fourth Amendment in obscenity cases, the record in the present

case does not support defendant's conclusion.

 It is clear that in situations in which the materials to be seized pursuant to a search warrant are presumptively under the protection of the First Amendment, the requirements of the Fourth Amendment must be adhered to strictly. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 564–65, 98 S.Ct. 1970, 1981, 56 L.Ed.2d 525, 541 (1978); *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 511–12, 13 L.Ed.2d 431, 437 (1965); *Marcus v. Search Warrant of Property*, 367 U.S. 717, 732–33, 81 S.Ct. 1708, 1716–17, 6 L.Ed.2d 1127, 1137 (1961); *United States v. Guarino*, 729 F.2d 864, 867 (1st Cir.1984). In making a determination of probable cause for the issuance of a search warrant, a magistrate must concern himself with two specific elements of the warrant requirement. First, he must ensure that the items to be seized are described with particularity. *Stanford v. Texas*, 379 U.S. at 485, 85 S.Ct. at 511–12, 13 L.Ed.2d at 437; *United States v. Guarino*, 729 F.2d at 867. Second, a magistrate must be certain that the affidavit provides him with enough detail to enable him "to focus searchingly on the question of obscenity." *Marcus v. Search Warrant of Property*, 367 U.S. at 732, 81 S.Ct. at 1716, 6 L.Ed.2d at 1136. In short, "[w]here presumptively protected materials are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field." *Zurcher v. Stanford Daily*, 436 U.S. at 564, 98 S.Ct. at 1981, 56 L.Ed.2d at 541.

 In the present case, defendant argues that the affidavit fails to inform the magistrate that the two scenes described were depicted in a patently offensive way. He also argues that the affidavit does not indicate the total number of scenes showing the type of explicit sexual conduct described in the affidavit. In addition, defendant claims that the affidavit fails to inform the magistrate of the duration of the two scenes described from each film and therefore provided him with insufficient information upon which to make a determination that there was probable cause to find that the films, taken as a whole, were obscene.

We are satisfied that the affidavit in question was specific and detailed enough to allow the magistrate to "focus searchingly upon the question of obscenity." [2]

---

2. The affidavit is as follows:

"I, Detective Anthony M. Pesare, do depose and say:

"That I am a member of the Rhode Island State Police and have been continuously employed in this capacity for the past six years. I am presently assigned to the Detective Division with other members of the Rhode Island State Police.

"As a result of a complaint received at R.I. State Police Headquarters about The Palace located at 85 Washington St., West Warwick R.I. showing pornographic movies, your affiant and Detective Gerald A. Prendergast were assigned, yesterday, February 20, 1981 to attend and view two x-rated films at the movie theatre The Palace.

"At approximately 8:07 P.M. on February 20, 1981 your affiant and Det. Gerald A. Prendergast each paid a $5.00 admission fee and entered the theatre. We received no ticket stub for our admission to the show. We then proceeded to the movie theatre which billed two movies 'Baby Blue' and 'Maraschino Cherry.'

"Your affiant entered the show where a short subject was just ending. Upon the completion of the short, a film entitled 'Baby Blue' starring Gina Harow was shown at 8:18 P.M. The plot revolved around two couples and a young girl and her boyfriend. A scene viewed by your affiant took place on the couch of a house. A male and a female were engaged in various sexual activity. The female performed fellatio on the erect penis of the male. The male then performed cunnilingus on the female and the two then engaged in sexual intercourse which culminated in the male withdrawing his penis from the vagina of the female and ejaculating on her stomach.

"In another scene from 'Baby Blue' your affiant observed two females engaged in homosexual activities. The two females performed cunnilingus on each other on a floor near a fireplace. During the scene the two also engaged in mutual masturbation. This activity took place under the watchful eye of a male character in the film.

"Your affiant viewed many other scenes in this picture involving males and females engaged in sexual acts such as intercourse, fellatio, cunnilingus and masturbation.

"At the end of the first film a second movie entitled 'Maraschino Cherry' was shown. The

Contrary to defendant's argument, the Superior Court justice who issued the search warrant could reasonably find, on the basis of the affidavit, probable cause under all three elements of the standard set forth in *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419, 431 (1973),[3] and § 11–31–1, that the films taken as a whole were obscene.

A reading of the affidavit submitted by the State Police detective makes it very clear that the issuing magistrate could have reasonably found probable cause that the scenes described were depicted in a patently offensive way. The affidavit related these passages in graphic detail, leaving nothing to the imagination. Furthermore, as the state points out, defendant concedes that a magistrate could conclude from the scenes described in the affidavit that both films met the second prong of the *Miller* test.

Regarding the defendant's assertion that the affidavit was deficient in that it only related to a small portion of the film, it seems clear that these scenes "contained successive acts which common sense dictates would require several minutes to perform and thus would consume a substantial portion of the entire film * * *." *United States v. Middleton*, 599 F.2d 1349, 1359 (5th Cir.1979). The affiant also stated that he reviewed many other scenes showing various explicit sexual acts. Given the relatively short length of the films, we are satisfied that the affidavit provided the magistrate with a sufficient understanding of each of the films. We find, therefore, that the trial justice did not err in denying defendant's motion to suppress the films seized.

For the reasons stated, the defendant's appeal is denied and dismissed, the judgment of conviction entered below is hereby affirmed, and the case is remanded to the Superior Court.

BEVILACQUA, Chief Justice, with whom KELLEHER, Justice, joins, dissenting.

I must respectfully dissent from the majority's findings on the question of whether

---

plot revolved around a woman who owns a house of pleasure in New York City. She is visited by her younger sister and proceeded to show her the ins and outs of running such a business.

"One scene involves two male customers of the establishment who are with the younger sister. The younger sister performs fellatio on both of them. She then performs fellatio on one, while the other places his erect penis into her vagina from the rear.

"Another scene takes place in the basement of the house and involves four women. One of the women is kneeling on a metal table where she is forced to hold her arms outstretched and balance two glasses of liquid. Her breasts are suspended over a hot plate. One of the females then lubricates her anus with a large quantity of K–Y jelly. She then inserts a dildo into the anus of the female. After moving the dildo in and out of the anus she removes it and inserts a larger dildo into the anus. She moves this imitation penis in and out of the anal cavity before she finally removes it.

"Your affiant viewed many other scenes in this movie which were sexual in nature and showed various acts of intercourse, fellatio and cunnilingus.

"After viewing 'Baby Blue' and 'Maraschino Cherry' in their entireties your affiant and Det. Gerald A. Prendergast left the theatre at 10:50 P.M. on February 20, 1981.

"Therefore, it is your affiant's belief that taken as a whole the above mentioned motion pictures/movies are obscene as defined in 11–31–1 of the General Laws of Rhode Island, 1956, as amended, in applying contemporary community standards. Each motion picture/movie taken as a whole appeals to the prurient interest in sex, which portrays sexual conduct in a patently offensive way, and in which taken as a whole, lacks serious value.

"Therefore, it is your affiant's request that permission be granted to search and seize the two above mentioned motion pictures/movies and the business records relating to the aforementioned motion pictures/movies."

3. The *Miller* test is as follows: "(a) whether 'the average person, applying contemporary community standards' would find the work, taken as a whole, appeals to the prurient interest * * *; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419, 431 (1973).

the state was barred from instituting criminal charges against the defendant.

In *State v. Berberian*, R.I., 427 A.2d 1298, 1301 (1981), we held that

"when an authoritative government agency or voice issues an official assurance or affirmatively misleads a defendant into believing that criminal sanctions do not apply to his behavior, no criminal sanctions will attach to the defendant because the defendant has been deprived of notice about what conduct the government intended to make criminal in violation of due process."

The defendant sought and was granted a license to show motion pictures at his theater month after month by the West Warwick Town Council. It is true, as the majority points out, that the February 1981 license granted by the town council was not a license to show the two specific films in question. Nevertheless, it is abundantly clear that the town council was aware that defendant was showing X-rated movies at his theater. The defendant as well as the previous owner had been involved in a longstanding dispute with town officials over the showing of X-rated films. Moreover, defendant advertised his theater's showing of X-rated films on a weekly basis in the newspaper. Furthermore, the order temporarily restraining the West Warwick Chief of Police and the town council from harassing or interfering with the exhibition of motion-picture films at the theater was no longer in effect when defendant was granted a license to show films for the month of February 1981. Thus, as the majority correctly points out, it was of no consequence whether the license was issued "[p]ursuant to Court Order 75–262." Not bound by any court order and fully aware that defendant was showing X-rated movies at his theater, the town council could have asked to view the films that defendant planned to show or could have commenced proceedings under G.L.1956 (1976 Reenactment) § 5–22–5. Instead, the town council chose to issue defendant a license to show what the town knew to be X-rated movies, thereby affirmatively mis-leading defendant to believe that his conduct in showing X-rated films met with the approval of the town council.

Additionally, the majority contends that the present case is distinguishable from *Berberian* in that in the present case the town of West Warwick had not adopted a procedure for viewing films and making a determination whether to grant a license or to commence proceedings to adjudge films obscene. What the majority fails to explain is why the town council did not follow the procedure set forth in § 5–22–5, which provides that where

"a license for any particular performance, show or exhibition [is sought] and the town council, [or] the board of police commissioners * * * is of the opinion that the said license should not be granted on the ground that the said performance, show or exhibition is obscene, the said town council, [or] the board of police commissioners * * * shall within forty-eight (48) hours of the filing of such application, either grant the license sought or commence a suit * * * by the filing of a complaint wherein shall be contained prayers that the said performance, show or exhibition be adjudged obscene and that the * * * [applicant] * * be permanently enjoined from presenting or conducting it in the particular city or town."

The town council never instituted proceedings pursuant to § 5–22–5, as it should have if it believed that the defendant was showing obscene films. As a result, I feel that the issuance of the license by the West Warwick Town Council gave the defendant sufficient assurance for believing that the showing of the films in question was conduct for which he could not be criminally sanctioned.

I would therefore sustain the defendant's appeal, vacate the judgment of conviction, and grant the motion to dismiss.