## UNITED STATES of America

v.

## Robert NILSEN, Defendant.

### Crim. No. 79–325.

United States District Court,
D. New Jersey.

Jan. 11, 1980.

Terence P. Flynn, Asst. U.S. Atty., Newark, N. J., for plaintiff.

Michael D'Alessio, Jr., Wilson & D'Alessio, West Orange, N. J., for defendant.

COOLAHAN, Senior District Judge.

Defendant Robert Nilsen is charged with four (4) violations of 18 U.S.C. § 1461[1] (mailing obscene matter). Indictment No. 79–325, Counts I–IV. Presently before the Court is defendant's motion to suppress evidence seized by the Government during searches authorized by warrants issued by United States magistrates. Rules 12(b), 41(f), Federal Rules of Criminal Procedure.

Oral argument was heard on December 12, 1979, at which time the Court took the

---

1. 18 U.S.C. § 1461 provides in pertinent parts that

"Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance; and—

Every article or thing designed, adapted, or intended for producing abortion, or for any indecent or immoral use; and

Every article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion, or for any indecent or immoral purpose; and

Every written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, or how, or from whom, or by what means any of such mentioned matters, articles, or things may be obtained or made, or where or by whom any act or operation of any kind for the procuring or producing of abortion will be done or performed, or how or by what means abortion may be produced, whether sealed or unsealed; and

Every paper, writing, advertisement, or representation that any article, instrument, substance, drug, medicine, or thing may, or can, be used or applied for producing abortion, or for any indecent or immoral purpose; and

Every description calculated to induce or incite a person to so use or apply any such article, instrument, substance, drug, medicine, or thing—

Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section or section 3001(e) of title 39 to be nonmailable, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, or knowingly takes any such thing from the mails for the purpose of circulating or disposing thereof, or of aiding in the circulation or disposition thereof, shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense, and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter. . . ."

Defendant is also charged with aiding and abetting four (4) violations of 18 U.S.C. § 1461. 18 U.S.C. § 2.

instant motion under advisement. After a careful review of the record and due consideration of the arguments and counter-arguments of the parties, I conclude that the search warrants in question were, at the time of their issuance, founded upon probable cause and that the warrants described with the requisite constitutional particularity the things to be seized. Accordingly, defendant's motion to suppress the admissibility at trial of evidence seized pursuant to the seventeen (17) search warrants in issue should be denied.[2]

## I. INTRODUCTION

Some preliminary explanation sets the stage for decision. A total of seventeen (17) search warrants relevant to the instant motion were issued by two different United States magistrates.[3] The fifth search warrant, chronologically speaking, authorized the search of defendant's home and seizure of certain things if found therein. The first three warrants authorized the search and seizure of mail found in defendant's post office box. The fourth search warrant authorized a search of defendant's automobile.[4] With minor variations not material here, a review of the seventeen warrants discloses that each succeeding search warrant affidavit recounts virtually verbatim the affidavit in support of the preceding warrant, and additionally sets forth the results of the preceding search.

The parties have urged that I focus on the warrant authorizing a search of defendant's home (the fifth warrant), apparently because most, if not all, of the relevant evidence, was seized by the Government there. If the search warrant for defendant's home (the fifth warrant in time) and its execution is held unconstitutional, defendant argues the subsequent warrants will fall as well. In view of my unfavorable disposition of this motion, I need not and do not reach that point. Nevertheless, at the outset, the Court expresses its appreciation to counsel for both parties for their constructive efforts to narrow the issues presented.

The Court takes the facts pertinent to this motion from the affidavit of Postal Inspector Bruce Gentile which was filed with the United States magistrate in support of the application for the warrant authorizing search of defendant's home (the fifth warrant), which is reprinted in full in the Appendix to this Opinion (hereinafter "Gentile Aff., App.").

Defendant advances essentially four contentions in support of his suppression motion, two with respect to the search warrant affidavit and two with respect to the warrant itself. As to the former, he urges that the affidavit does not support the magistrate's finding of probable cause to search defendant's house in that it is based upon stale information and uncorroborated hearsay. As to the latter, defendant argues that the warrant authorizes seizure of so many "things" that it is tantamount to a "general" warrant proscribed by the Fourth

---

2. Defendant also moved to suppress the admissibility of certain verbal statements he allegedly made to the Government agents searching his home. Defendant indicated in his brief, however, that at least for the purposes of the instant motion, the Court should assume that the sole ground in favor of suppression of the defendant's alleged oral statements is that such statements would not have been made if the agents were not then engaged in a search of defendant's home. Thus, defendant urges, such statements should also be suppressed as the fruit of a poisonous tree, see, *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), if the search warrant for defendant's home or its execution is held unconstitutional. In view of the Court's holding today that the warrants and their execution were valid, defendant's motion to suppress his oral statements allegedly made to Government agents engaged in a search of defendant's home should also be denied. If the defendant seeks to suppress the admissibility of the oral statements on a different theory, the Court will consider his motion just prior to the commencement of trial.

3. Copies of each of these 17 warrants, together with their respective supporting affidavits, were submitted to the Court by the Government as Exhibits A–Q to its brief.

4. Defendant's automobile apparently was parked at his home at the time the search of his home was undertaken. The automobile was also searched at that time. Representations have been made by defendant that no evidence was seized from defendant's automobile. The Court has assumed this to be the case.

Amendment,[5] and further urges that the warrant fails to scale the higher standard of "reasonableness" attending upon the search and seizure of materials arguably protected by the First Amendment. I shall address each of defendant's arguments *ad seriatim*.

## II. THE SEARCH WARRANT AFFIDAVIT

### A. *Staleness*

Defendant's first argument rests upon his contention that the affidavits of Postal Inspector Gentile, and in particular, the fifth search warrant affidavit, were grounded upon stale, dated information. As such, he reasons, the affidavits do not demonstrate probable cause since the magistrate must base his finding upon information showing probable cause at the time of the application.

■ The touchstone of analysis is of course the language of the Constitution itself. The Fourth Amendment guarantees

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Defendant is unquestionably on firm ground when he states "that there must be a sufficient basis [for a magistrate to conclude] that probable cause as alleged in the affidavit exists at the time" the warrant is issued. Def. Br. at 10. *See also* Letter from defendant's counsel to the Court (Dec. 17, 1979). As the Supreme Court stated nearly a half-century ago:

"[I]t is manifest that the proof[6] [before the magistrate] must be of facts so closely related to the time of the issue of the warrant as to justify a finding of proba-

ble cause at that time. Whether the proof meets this test must be determined by the circumstances of each case." *Sgro v. United States*, 287 U.S. 206, 210–11, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932). *See generally Rosencranz v. United States*, 356 F.2d 310 (1st Cir. 1960).

■ Probable cause, of course, deals with probabilities. In these circumstances, it means evidence, though not necessarily admissible, as would persuade a man of reasonable caution to believe that an offense was or is being committed and that evidence of assistance in securing an apprehension or conviction of the perpetrator likely will be found in the place(s) to be searched. *See* Rule 41(b), Federal Rules of Criminal Procedure. *See also Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), *quoting Locke v. United States*, 11 U.S. (7 Cranch.) 339, 348, 3 L.Ed. 364 (1813); *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

Defendant's central factual argument concerning staleness relates to the first series of search warrants executed on CRS Color Lab envelopes (Government Br., Ex. A–C). Within the affidavit in support of the first search warrant, however, (as recounted virtually verbatim in paragraphs 1–8(b) of the Gentile Aff., App., in support of the fifth warrant), there is evidence upon which the magistrate could independently discern a pattern of continuing activity on defendant's part beginning in early 1976 and continuing up to August-September 1979.

A brief synopsis of the affidavit belies any conclusion to the contrary. It begins in 1976 with reports of interviews with employees of GAF Photo Service revealing repeated mailings of negatives, at least some of which the magistrate could reasonably conclude were obscene. Gentile Aff.,

---

**5.** As discussed *infra*, Part III(A), defendant contends that where a warrant authorizes seizure of virtually any paper or thing evidentiary in nature, it is akin to a general warrant proscribed by the particularity clause of the Fourth Amendment.

**6.** The Supreme Court's use of the term "proof" is perhaps slightly misleading, for "proof of the crime is supposed to be the result of a search, not a required precondition of the search." *United States v. Giacalone*, 541 F.2d 508, 514 (6th Cir. 1976).

App., ¶¶ 2, 3(2)–(3). Confirmatory of the ongoing nature of defendant's alleged activities were the series of mailings between the defendant and American Photo in Philadelphia during 1978. Also significant is the note allegedly from defendant to American Photo contemplating future "order[s]". Interviews with employees of CRS Color Lab during March through August 1979 further corroborate the probability that defendant was continuing to violate the applicable statute. Gentile Aff., App., ¶¶ 5–6. Finally, from August 31, 1979 until just before the issuance of the fifth search warrant on September 12, 1979, Inspector Gentile's affidavit disclosed a series of mailings to defendant's post office box. A search pursuant to the first, second and third warrants of the items contained therein revealed a "series of photographs of young boys with their shirts off, posing and flexing their muscles. One photo depicted Nilsen standing in a bikini brief with an adolescent girl kneeling next to him with her hand near his crotch." Gentile Aff., App., ¶ 8. Even if, as seems likely, these photographs are not obscene, nevertheless they far from negate probable cause.

■ The timeliness of probable cause cannot be assessed in a factual vacuum. Rather, timeliness and its converse, staleness, must be measured by the *nature and regularity* of the allegedly unlawful activity.

"Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant."

*United States v. Johnson,* 461 F.2d 285, 287 (10th Cir. 1972), *quoted in United States v. Harris,* 482 F.2d 1115, 1119 (3d Cir. 1973).

Questions of timeliness require "review on a case-by-case basis." *United States v. Harris, supra,* 482 F.2d at 1119. Here the magistrate could reasonably conclude that defendant had been engaged in on-going violations of the applicable statute over a three-year period. Even more importantly,

he could independently determine from the affidavit that "there was no reason to believe that this operation had ceased." *United States v. Forsythe,* 560 F.2d 1127, 1132 (3d Cir. 1977). "Considering the nature of the items named in the [fifth] warrant, it was reasonable to expect that they would remain in defendant's possession and on his premises for some period of time, at least for a month." *United States v. Matthews,* 572 F.2d 208, 209 (9th Cir. 1977) (*per curiam*) *citing Andresen v. Maryland,* 427 U.S. 463, 478–79 n. 9, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976).

■ I therefore reject defendant's argument that the observations contained in Inspector Gentile's affidavit were too stale to establish probable cause at the time of issuance of the fifth search warrant. "It was certainly reasonable for [the] magistrate, concerned only with a balancing of probabilities, to conclude that there was a reasonable basis for a search" of defendant's home. *United States v. Harris,* 403 U.S. 573, 579 n. *, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723 (1971).

### B. *Uncorroborated Hearsay*

For his second argument, defendant asserts that the search warrant affidavit is defective in that it is based in part upon uncorroborated and unreliable hearsay. Specifically, he argues that the second-hand statements of employees of the photo developing concerns, Gentile Aff., App., ¶¶ 2–3, 5–6, 8A–9, cannot be credited because the affiant did not set forth the underlying circumstances from which one could reasonably infer the declarants' reliability and the basis for the declarants' observations. In the absence of information establishing a "substantial basis" for crediting the hearsay contained in Inspector Gentile's affidavit, defendant argues, the affidavit is insufficient on its face, *Jones v. United States,* 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). *See also Spinelli v. United States,* 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

■ In reviewing the search warrant affidavit in the context of a motion to sup-

press, the Court of course is limited to a consideration of the four corners ·of the affidavit. *E. g., Aguilar v. Texas, supra,* 378 U.S. at 109 n. 1, 84 S.Ct. 1509; *United States v. Casino,* 286 F. 976 (S.D.N.Y.1928) (per Hand, L., J.). Yet, even this limited review convinces the Court that defendant's reliance on the *Jones-Aguilar-Spinelli* line of cases is misplaced.

■ It is now settled that *Jones-Aguilar-Spinelli* and their progeny are specifically directed at the peculiar problems in assessing tips from anonymous or "professional" informants. *United States v. Burke,* 517 F.2d 377, 380 (2d Cir. 1975) (per Friendly, J.).[7] Where the declarant of the hearsay contained in the search warrant affidavit is a victim or other innocent and disinterested witness, such as an employee, there is "built-in" a substantial basis for crediting the reliability of the declarant and the credibility of his conclusion.[8] As one Circuit recently stated: "These were not professional informants, but known private citizens giving good faith observations upon which it was reasonable [for the magistrate] to rely." *United States v. McCrea,* 583 F.2d 1083, 1085 (9th Cir. 1978). "Here the statements [in Inspector Gentile's affidavit] were made by persons whose positions of employment [gave] them the opportunity to personally observe the allegations contained in the affidavit." *United States v. LaMonte,* 455 F.Supp. 952, 958 (E.D.Pa. 1978), *citing inter alia, United States v. Hunley,* 567 F.2d 822, 825 (8th Cir. 1977); *United States v. Swihart,* 554 F.2d 264, 268–69 (6th Cir. 1977); *United States v. Darensbourg,* 520 F.2d 985, 988–89, *mod'd,* 524 F.2d 233 (5th Cir. 1975). *Accord, Rutherford v. Cupp,* 508 F.2d 122, 123 (9th Cir. 1974) (*per curiam*), *cert. denied,* 421 U.S. 933, 95 S.Ct. 1663, 44 L.Ed.2d 92 (1975).

■ Inspector Gentile's search warrant affidavit relates declarations of private citizens identifying themselves by name and place of employment. These declarants provided the Government with good faith observations upon which the magistrate could permissibly rely in reaching his independent determination of the existence of probable cause. In the first instance, employees of GAF Photo Service provided straightforward information to Postal Inspectors who, in turn, were identified. The same was true of the manager of American Photo and the employees of CRS Color Lab. Each of these declarants described his own factual observations obtained during the ordinary course of his employment. Each declarant supported his observations by showing the Government agents documents and photographs which demonstrated the circumstances underlying his conclusion. In addition to internal consistency, the fair uniformity of the observations of employees of each of the three unrelated photo developing concerns also provides a "substantial basis", *Jones v. United States, supra,* 362 U.S. at 269, 80 S.Ct. 725, for crediting their statements.

Therefore, I likewise reject defendant's argument that there was not a substantial basis upon which the magistrate could credit the hearsay contained in Inspector Gentile's affidavit.

## III. THE SEARCH WARRANT

### A. *"General"* Warrant

The defendant's next argument is that the warrants, and, in particular, the critical fifth warrant, were in fact "general" warrants allowing sweeping and indiscriminate rummaging by Government agents through defendant's papers and effects. As defendant correctly states, the warrant must meet the requisite degree of particularity guaranteed by the Fourth Amendment or it is invalid.

"The requirement that warrants shall particularly describe the things to be

---

**7.** In large measure, the alleged deficiency of the hearsay in Inspector Gentile's search warrant affidavit is the lack of a showing of the reliability of the employees of the photo developing concerns interviewed by the Government agents; the affidavit does set forth the means by which the declarant employees obtained their knowledge (personal observation during the ordinary course of employment).

**8.** *United States v. Harris,* 403 U.S. 573, 581, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), also supports this conclusion.

seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is taken, nothing is to be left to the discretion of the officer executing the warrant."

*Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927), *quoted in Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965), *and in Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976).

■ The critical fifth search warrant authorizing a search of defendant's house states in pertinent parts as follows:

"Affidavit(s) having been made before me by Postal Inspector Bruce Gentile that he has reason to believe that (on the premises known as) 33 Wayland Drive, Old Bridge Township, New Jersey being a two story wood frame red shingled private residence with a garage beneath which faces out Roanoke Avenue, and one 1973 white Cadillac with license # RLK–525 there is now being concealed certain property, namely camera equipment, photographs, slides, film (developed and undeveloped), negatives and magazines depicting children under the age of sixteen years engaged in sexually explicit conduct, including sexual intercourse, including genital-genital, oral-genital, and anal-genital, or oral-anal, beastiality, masturbation and exhibition of the male genitals in the state of erection, as well as any photographs of those individuals who have been previously involved as participants in said sexually explicit conduct as indicated in the photographs obtained as set forth in paragraphs 2, 5 and 6 of [the search warrant affidavit of Postal Inspector Gentile, App.] affidavit as well as any photographs of individuals so involved as determined as result of observations of photographs during this search, as well as any correspondence, typed, taped or writ-

ten, checkbooks, stubs, film orders and receipts reflecting the ongoing business of producing and/or mailing matter involving photographs of minors engaged in sexually explicit conduct."

Faced with a search warrant which is a model of exactitude, defendant's counsel contended during oral argument that it nevertheless was in the nature of the proscribed "general" warrant because it authorized the seizure of so many of defendant's "things". Conceding the lack of precedent for his position, defendant's counsel went on to assert that the policy underlying the "particularly describing" clause of the Fourth Amendment supports his supposition. After review of the pertinent cases, the Court declines to accept defendant's bold and unsupported invitation to make new law.

■ Contrary to the assertion of defendant, the policy and principles effectuated by the specificity clause of the Fourth Amendment do not support his argument. The fifth warrant did *not* leave "it entirely to the discretion of the officials conducting the search to decide what items were likely obscene and to accomplish their seizure." *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 326, 99 S.Ct. 2319, 2324, 60 L.Ed.2d 920 (1979). Specific in its terms, the warrant provided the Government agents executing it with firm parameters as to what could lawfully be seized. *Cf. Marcus v. Search Warrant,* 367 U.S. 717, 732, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). As the Government observes in its brief, neither the term "obscene" nor any other "term of art" is utilized in the warrant itself. If a general phrase in a warrant authorizing seizure of "other fruits, instrumentalities and evidence of crime at this [time] unknown" is not constitutionally overbroad, *Andresen v. Maryland, supra,* 427 U.S. at 479–82, 96 S.Ct. at 2748, it follows that the specificity articulated in this warrant meets constitutional muster.[9] Indeed, the warrant left

---

9. Of course, the courts must give full effect to the particularity requirement of the Fourth Amendment "when the 'things [to be seized]' are books, and the basis for their seizure is the ideas which they contain." *Stanford v. Texas, supra,* 379 U.S. at 485, 85 S.Ct. at 511–512

(citations omitted). But any contention that search warrants simply cannot authorize seizure of materials arguably within the orbit of protection of the First Amendment is not well-founded. *See generally Heller v. New York,*

little if any room for the Government agents to exercise *ad hoc* discretion as it describes the evidence to be seized in minute and graphic detail. The Court, therefore, does not accept defendant's argument that the fifth warrant is akin to a "general" warrant.

B. *Existence of Probable Cause In Light of First Amendment Requirements*

Defendant's final argument is that, taken as a whole, the warrants in question do not comport with the requisite "higher hurdle" of reasonableness followed in reviewing warrants authorizing seizure of materials *arguendo* protected by the First Amendment. *Roaden v. Kentucky,* 413 U.S. 496, 504, 93 S.Ct. 2796, 2801, 37 L.Ed.2d 757 (1973). However, after extensive consideration of the principal Supreme Court decisions upon which defendant relies, the Court concludes that these warrants and their supporting affidavits were based on probable cause, even in light of the higher standards mandated by the First Amendment. *Cf. Lo-Ji Sales, Inc. v. New York, supra; Roaden v. Kentucky, supra; Lee Art Theatre v. Virginia,* 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968) (*per curiam*); *A Quantity of Books v. Kansas,* 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); *Marcus v. Search Warrant, supra.* Suffice it to say that this case, unlike most of those cited above, does not involve a massive seizure of all copies of a book or a film which is in the nature of a prior restraint on distribution. Rather, this case involves a warrant authorizing seizure of evidence of criminal activity. *See Heller v. New York, supra; cf. Warden v. Hayden, supra,* 387 U.S. at 307, 87 S.Ct. 1642.

The affidavit of Inspector Gentile allowed the magistrate to "focus searchingly" as required by *Lee Art Theatre v. Virginia, supra,* and *Marcus v. Search Warrant, supra,*[10] on the question of obscenity as

defined by the Supreme Court in *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The courts have not required that magistrates personally view the materials sought to be seized. *E. g., United States v. Middleton,* 599 F.2d 1349, 1357–58 (5th Cir. 1979); *United States v. Pryba,* 163 U.S.App.D.C. 389, 402, 502 F.2d 391, 404 (1974), *cert. denied,* 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975). My task here is to determine whether the manner and means by which the magistrate determined probable cause meet constitutional standards.

I conclude that the magistrate's judgment was properly exercised and his conclusion as to the existence of probable cause was well-founded. The magistrate had probable cause to believe that evidence of a crime would be contained in the first series of CRS film envelopes. He knew that an individual named R. Nilsen had consistently used GAF Photo for a period of time during 1976. He had reason to believe that the film so mailed contained obscene material because, far from the cursory label "obscene" discredited in *Marcus v. Search Warrant, supra,* and far from the non-reviewable opinion and warrantless seizure condemned in *Roaden v. Kentucky, supra,* he had before him a dispassionate and factual explanation of the material mailed by the defendant. *Accord, United States v. Middleton,* 599 F.2d 1349, 1357–58 (5th Cir. 1979) (and cases cited therein).

The magistrate also could reasonably conclude that a similar consistent pattern developed between the defendant and American Photo in 1978. To this pattern was added the fact that the defendant was concerned with filling "orders" as well as the fact that he was ordering more than one copy of some of the slides in question, perhaps indicating a purpose of distributing

---

413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973).

**10.** In *Heller v. New York, supra,* the Supreme Court stated that the "searching focus" required under *Marcus* and *Lee Art Theatre* is addressed to the existence of probable cause, holding "constitutionally permissible" a seizure

conducted "pursuant to a warrant, issued after a determination of probable cause by a neutral magistrate, and, following the seizure, a prompt judicial determination of the obscenity issue in an adversary proceeding is available at the request of any interested party . . . ." 413 U.S. at 492, 93 S.Ct. at 2795.

the copies to more than one individual. This was further confirmed by the sheer volume of his dealings with the photo labs.

The magistrate could further consider the fact that this same defendant changed his postal box number in 1977 and sought to eliminate employment information from his box application, all from a concern for being under investigation.

The magistrate then learned that during 1979 the defendant had set up yet another consistent relationship with a mail-order film developing company, this time CRS Color Lab in Long Island. Again, the magistrate found that the August mailing of negative strips to CRS was not the first time the defendant had used CRS to develop this type of photograph. He also learned that the specific frames requested for development all showed "nude boys of minor age in stages of erection or engaged in genital contact with other boys." But of additional interest was the fact that on one of the film strips from which a print was requested, there was a frame showing an apparent picnic in the defendant's backyard, indicating that the camera used to take pictures of the defendant's home, and presumably located there, was also being used to take pictures of nude minors engaged in explicit sexual conduct. Moreover, an employee of CRS also identified the adult male pictured in the picnic as being one she had seen masturbating a young boy in another set of photographs submitted to CRS by Nilsen earlier. This further established that Nilsen was not only mailing obscene matter but that there was reason to believe that he was involved in its production.

The magistrate was then informed that CRS Color Labs, the same firm to which Nilsen had sent obscene film in the immediate past, had sent three film mailers to the defendant's box at the Cliffwood Post Office. Thus, he had reason to believe, based on the past history of the case, that the same pattern of mailing obscene matter was continuing, and that the contents of those mailers would contain evidence of the mailing of obscene matter and the sexual exploitation of children.

Much has been made by the defendant about the results of the search of the first series of CRS envelopes, the ones which were found to contain young males posing and flexing their muscles while naked to the waist. Yet, the very nature of the photographs, considered in light of the subject matter portrayed in earlier mailings by the defendant, far from dispelling probable cause, served only to confirm the ongoing pattern of the defendant's conduct. The fact that Postal Inspectors did not seize the photographs sent does nothing to dispel an inference that these photos did in fact constitute evidence of the crimes involved.[11]

Finally, the magistrate required some confirmation as to where the photographs obtained by the defendant were actually located. That was accomplished when the prints he had ordered from CRS were placed, as per the return address supplied by the defendant, in his mailbox at the Cliffwood Post Office. When the defendant was observed taking the parcel to his house, the reasonable conclusion that he was storing the obscene material in his home was confirmed, giving the magistrate probable cause to conclude that evidence of the crimes of the mailing obscene matter and the sexual exploitation of children would be found in that house.

The Fourth Amendment's preference for the use of search warrants, a procedure affording an independent determination of probable cause by a neutral and detached magistrate, is not to be taken lightly. It finds expression in the considerable deference accorded to the magistrate's finding of probable cause. *Spinelli v. United States,* *supra,* 393 U.S. at 419, 89 S.Ct. 584; *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Jones v. United States, supra,* 362 U.S. at 270–71, 80 S.Ct. 725; *United States v: Middleton, su-*

11. On January 7, 1980, the Court reviewed the photographs referred to in paragraphs 8–8(c) of Inspector Gentile's search warrant affidavit in order to determine whether Inspector Gentile's affidavit description of those photographs was accurate. The descriptions in the search warrant affidavit indeed appear to be accurate.

*pra,* 599 F.2d at 1356 n. 7 (and cases cited therein); *United States v. Hatfield,* 599 F.2d 759, 761 (6th Cir. 1979); *United States v. Allen,* 588 F.2d 1100, 1106 (5th Cir.), *reh. denied,* 593 F.2d 709, *cert. denied sub nom., Perkins v. United States,* 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979); *United States v. McNally,* 473 F.2d 934, 937 (3rd Cir. 1973). "[M]agistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense." *Spinelli v. United States, supra,* 393 U.S. at 419, 89 S.Ct. at 591.

For all of these reasons, the Court concludes that the seventeen search warrants in question were founded upon probable cause.

## CONCLUSION

For all of the foregoing reasons, the Court concludes that defendant's motion to suppress evidence of violations of 18 U.S.C. § 1461 is not well-founded in fact or in law and should be denied. The Court requests that the Government submit to Chambers an Order effectuating this opinion.

Trial of this action is hereby set down for 10:00 A.M. in the forenoon of January 21, 1979.

## APPENDIX

STATE OF NEW JERSEY )
                 ) SS   A F F I D A V I T
COUNTY OF ESSEX )

I, Bruce Gentile, being of full age and duly sworn do declare and state the following:

1. I am a Postal Inspector for the United States Postal Service assigned to the Newark Office. I have been assigned to this investigation into the illegal mailing of obscene matter in violation of Title 18, United States Code, Section 1461 and the sexual exploitation of children in violation of Title 18, United States Code, Section 2251 et seq. by Robert Nilsen, 33 Wayland Drive, Matawan, New Jersey and others. As a result of my personal investigation as well as that of other Postal Inspectors and Special Agents of the Federal Bureau of Investigation, I have learned the following:

2. On July 20, 1976, Postal Inspector D. G. Fast interviewed Dorothy Montgomery, clerk of GAF Photo Service, 4747 North Broad Street, Philadelphia, Pennsylvania who told him that in the course of her work of preparing finished photo products she had recently observed a series of photo negatives sent in for additional prints by a Robert Nilsen with a return address given as Box 447, Cliffwood, New Jersey. She stated that she noticed the photographs because of their "obscene" content.

3. On that same date, Inspector Fast spoke with Rosemary Rose, Customer Service manager for GAF Photo Service who told him that from the beginning of 1976, the company had received several orders from Nilsen, which they declined to process due to its content. Mrs. Rose showed photographs retained by GAF which had been made by negatives submitted by Nilsen. They included:

(1) 8 (Black & White) of a minor female displaying the genital area.

(2) 2 (color) of a young boy, age 9–12, committing the act of fellatio on another boy.

(3) 2 (color) of a young teenage boy displaying the genital area.

3. On August 2, 1976, Postal Inspector J. M. Donovan was shown the following photographs sent in by Nilsen to GAF for processing, all of which showed subjects of estimated ages between 8 and 15:

(1) 20 (Black & White) of young boys in a locker room.

(2) 30 35mm slides of teenage girls in various stages of dress.

(3) 20 (color) of nude boys, eight of which depict genital contact.

(4) 8mm film of a young teenage girl undressing and masturbating.

4. A check of the Post Office box 447 at the Cliffwood Post Office at that time showed that it was opened by a Robert Nilsen, 33 Wayland Drive, Matawan, New Jersey on June 23, 1970. On December 21, 1977, the Postmaster at Cliffwood advised that Nilsen had changed box numbers from 447 to 548 during October, 1977. At that time Nilsen said he believed he was under

investigation and wanted to change the information on his application to delete his business address.

5. I have been advised by Special Agent Gail Ann Denman of the FBI that on July 26, 1978, Special Agents Stott and Harelson spoke with Anthony Frisco, Manager, American Photo, 900 Granite Street, Philadelphia who told them that his company is in the mail order film developing business. He said that in the course of business they had received a telephone call from Nilsen asking to be put on the company's mailing list. He said that the account was thereafter carried in the name of Robert Nelson, P.O. Box 548, Cliffwood, New Jersey, 07721. He provided a memo mailed from the company to Nelson dated March 20, 1978, explaining the quoted price for negative work. The memo was returned by Nilsen with a note written: "If we keep holding things up, I'm going to lose the order. Please rush sample standard print on this slide so I can present it to him, send new mailer." It was signed "Bob." Frisco further explained that on May 4, 1978, his company received an order which included 85 different slides with the request that 101 copies be made from them. The agents were shown the slides and found them to be pictures of boys in ages ranging from 8–15. The slides showed the figures in various stages of undress, most being nude poses and some showing the subjects in acts of masturbation or other genital contact.

6. Beginning on August 17, 1979, I spoke on a number of occasions with Dominic Seminara, of CRS Color Lab who told me that about three months ago in a quality control check within his mail order film processing firm, an employee Isabel Bishop brought to his attention a series of film strips submitted by a Robert Nilsen for copying. Seminara told me that the address used by Nilsen was Box 548, Cliffwood, New Jersey. Isabel Bishop remembered that the prints developed from the negatives Nilsen submitted depicted nude young boys engaged in various forms of sexual conduct including masturbation. Bishop added that about a month ago she observed a second set of negatives to be worked into prints, these again including nude young boys engaged in various forms of sexual conduct. She particularly remembered one photograph wherein an adult male held a young boy in his lap, kissing and masturbating the boy. Finally, Seminara showed me a series of film negative strips recently received from Nilsen. The order requested the making prints of certain frames on the strips. Each print requested involved nude boys of minor age in stages of erection or engaged in genital contact with others. Also included on one film strip were frames of a man, two women and two young girls in an apparent picnic setting. From prior surveillances in this case, I recognize the setting as being Nilsen's backyard. Ms. Bishop identified the man in those frames as being the man in the picture she had seen before wherein he was kissing and masturbating the young boy.

7. I spoke on August 31, 1979, with Special Agent Gail Ann Denman, of the FBI who told me that she recently obtained a copy of the yearbook for the 1975 class of P.S. 55, a school in which Robert Nilsen was then and is now employed as a teacher. A comparison between photos of young boys in the 1975 yearbook and those of the photos submitted by Nilsen for developing at American Photo Inc. in 1978, shows that some of the children featured in the yearbook strongly resemble those in photographs submitted by Nilsen for reproducing.

8. On August 31, 1979, I received word from the Postmaster, Cliffwood, New Jersey that a series of three film packets from CRS Color Lab arrived at Box 548 for Robert Nilsen. Two of the packets measuring 7–12″ by 5″, were brown manila with green markings, bearing serial numbers 304320 and 120968 respectively. The third was of the same size with red markings and serial number 232606. Each envelope bore the marking CRS–Color, 370 West Park Avenue, Long Beach, New York 11561 and each was addressed in handwritten blue ink to R. Nelson, Box 548, Cliffwood, New Jersey. Pursuant to a search warrant issued on August 31, 1979 on those three CRS–Color

Lab envelopes which had then arrived at Box 548 for Robert Nilsen, I opened those envelopes and saw in plain view a series of photographs of young boys with their shirts off, posing and flexing their muscles. One photo depicted Nilsen standing in a bikini brief with an adolescent girl kneeling next to him with her hand near his crotch.

8(a). On August 31, 1979, I spoke with an employee of the Cliffwood Post Office who told me that she was familiar with Nilsen. She stated that her sons had recently told her that while fishing off a local bridge, they were approached by Nilsen who asked them to remove their shirts so that he could take pictures of them.

8(b). On Saturday, September 1, 1979, I received word from the Cliffwood Post Office that on that date another CRS Color Lab 7½" × 5" manila envelope bearing green markings: CRS–Color, 370 West Park Avenue, Long Beach, N.Y. 11561 with serial # 450739 addressed to R. Nelson, Box 548, Cliffwood, N.J. 07721, had arrived in Nilsen's box.

8(c). Pursuant to a federal search warrant I opened and examined the contents of the envelope described in paragraph 8(b). While doing so, I observed in plain view photographs of a juvenile male naked to the waist and posing in various positions. ·

8(d). A further check with the Cliffwood Postmaster revealed that Nilsen received his routine mail at his address at 33 Wayland Drive, Matawan, New Jersey, while other mail including film material is received at P.O. Box 548.

9. On September 12, 1979, I deposited a CRS Color Lab envelope, and containing the photographs requested by Nilsen as set forth in paragraph 6, above, in P.O. Box 548 at the Cliffwood Post Office. At approximately 3:37, this date, I received word from Postal Inspector J. A. Latch, who is on surveillance at the Cliffwood Post Office who told me that he had just observed Nilsen arrive and pick up that envelope along with a series of other CRS envelopes and other packages from the box. Nilsen, who was observed arriving at the Post Office on a motorbike carrying his teenage daughter, was seen giving the envelopes and packages to his wife who was driving a white Cadillac, license # RLK–525. From prior work on this case I have found from the New Jersey registry of motor vehicles that Nilsen has registered to him a 1973 white Cadillac with license # RLK–525.

10. At 4:00 P.M. I received word from Postal Inspector Carl Pack that he had been informed over the radio by Postal Inspectors and Special Agents of the FBI that they had just followed the Cadillac to the house at 33 Wayland Drive in Old Bridge, where Special Agent Clarence Medford, FBI, observed the car being parked inside the garage. Nilsen was also observed parking his motorbike inside the garage. ·

From my own observations during this case, I have found 33 Wayland Drive, Old Bridge Township, New Jersey to be a two-story wood frame red-shingled private residence with a garage beneath which faces onto Roanoke Avenue.

11. Wherefore, I have probable cause to believe that on the premises and automobile described in the above paragraph there now exists evidence of the crimes of Sexual Exploitation of Children in violation of Title 18, United States Code, Section 2251 *et seq.,* and the mailing of obscene matter in violation of Title 18, United States Code, Section 1461, to wit, photographs, slides, films, negatives and magazines depicting children under the age of sixteen years engaged in sexually explicit conduct, including sexual intercourse, including genital-genital, oral-genital, and anal-genital, or oral-anal, beastiality, masturbation and exhibition of the male genitals in the state of erection, as well as any photographs of those individuals who have been previously involved as participants in said sexually explicit conduct as indicated in the photographs obtained as set forth in paragraphs 3, 5 and 6 of this affidavit as well as any photographs of individuals so involved as determined as result of observations of photographs during this search, as well as any correspondence, typed, taped or written, checkbooks, stubs, film orders and receipts reflecting the ongoing business of producing and/or mailing matter involving photographs of minors engaged in sexually explicit conduct, and I

respectfully request that a search warrant issue for the search of said premises and automobile.

BRUCE GENTILE
U.S. Postal Inspector

Sworn to and subscribed
before me this
day of September, 1979.

WILLIAM J. HUNT
United States Magistrate